Chinyere Valerie Ibe, Esq. (SBN 247242)
valerie@cvalerieibe-law.com
Law Offices of C. Valerie Ibe,
7220 Owensmouth Avenue, Ste 220
Canoga Park, CA 91303
Tel:818-900-5298

Attorney for Plaintiff,
Olachi Mezu-Ndubuisi, M.D.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLACHI MEZU-NDUBUISI, an Individual | Case No.: 2:23-cv-08516 |
| Plaintiff, | **COMPLAINT – TITLE VII CIVIL RIGHTS EMPLOYMENT DISCRIMINATION** |
| vs. | **FMLA INTERFERENCE** |
| | **FMLA RETALIATION** |
| UNIVERSITY OF WISCONSIN-MADISON; BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM; ROBERT GOLDEN, an Individual; ELLEN WALD, an Individual; RYAN MCADAMS, an Individual; UNITYPOINT HEALTH-MERITER HOSPITAL, AKA MERITER HOSPITAL, INC. a Corporation; PAM WETZEL, an Individual; SUE ERICKSON, an Individual; NINA MENDA, an Individual; MERITER EXECUTIVE BOARD COMMITTEE; AMANDA LINDSAY, an Individual; KARL NIBBELINK, an Individual; ELIZABETH PRITTS, an Individual; SHERRY HENSELER, an Individual; DOES 1-10, Inclusive. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, Olachi Mezu-Ndubuisi, M.D., O.D. (sometimes hereinafter, referred to as

"Dr. Mezu-Ndubuisi" or "Plaintiff") bringing this action against University of

Wisconsin-Madison, (sometimes referred to as "UW" or University of Wisconsin School of Medicine and Public Health" or "UWSMPH" ) and Board of Regents of the University of Wisconsin and UnityPoint Health-Meriter Hospital (hereinafter "Meriter" or "Meriter Hospital") and other Defendants and Defendants Does 1 to 10 and in support alleges as follows:

## BACKGROUND STATEMENT

1. This complaint tells the story of the defendants' systematic takedown of the Plaintiff's dignity, good name, reputation, job because she opposed and complained about the discrimination, retaliation, harassment, hostile work environment and disparate treatment that they subjected her to.

2. The history of discrimination against the Plaintiff, Dr. Olachi Mezu-Ndubuisi, her attempts to have that discrimination addressed and remedied and the continued retaliation, harassment, and hostile work environment against her for making those efforts goes back seven (7) years.

## PARTIES

3. Dr. Olachi Mezu-Ndubuisi is a resident of the City of Rochester, in the State of New York and at all relevant times was a resident of the State of Wisconsin.

4. Defendant, University of Wisconsin-Madison and all its colleges and schools, including the University of Wisconsin School of Medicine Public Health, is and at all relevant times a university and does business as University of

PLAINTIFF'S COMPLAINT

Wisconsin-Madison in Wisconsin located at 21 N. Park Street, Madison, WI 53715.

5.  Defendant, University of Wisconsin-Madison employs more than 501 people, and at no time relevant to this complaint did it ever employ fewer than 15 persons.

5A. At all times relevant hereto, the Board of Regents of the University of Wisconsin ("Board of Regents"), is a not-for-profit body and is located in Madison, Wisconsin and employs more than 501 people and at no time relevant to this complaint did it ever employ fewer than 15 persons.

6.  Defendant, Robert Golden was at all relevant times the Dean of the School of Medicine at the University of Wisconsin.

7.  Defendant, Ellen Wald was at all relevant times the chairperson of the Department of Pediatrics at the University of Wisconsin.

8.  Defendant, Ryan McAdams was at all relevant times the Division Chief of the Division of Neonatology, at the University of Wisconsin School of Medicine and Public Health.

9.  Defendant, UnityPoint Health-Meriter Hospital is and at all relevant times a corporation doing business in Wisconsin and whose address is 202 S Park St, Madison, WI 53715.

10. Defendant, UnityPoint Health-Meriter employs more than 501 people, and at no time relevant to this complaint did it ever employ fewer than 15 persons.

PLAINTIFF'S COMPLAINT

11. Defendant, Pam Wetzel, is and at all relevant times the Chief Medical Officer, UnityPoint Health-Meriter Hospital in Wisconsin and is employed by Meriter.

12. Defendant, Sue Erickson, is and at all relevant times has been the President and CEO, UnityPoint Health-Meriter Hospital and is employed by Meriter.

13. Defendant, Nina Menda, at all relevant times was the Director, Meriter NICU, Division of Neonatology in Wisconsin and is employed by University of Wisconsin.

14. Defendant, Meriter Executive Committee at all relevant times consisted of the Meriter Board of Directors of UnityPoint Health-Meriter in Wisconsin and are employed by Meriter.

15. Defendant, Amanda Lindsay is at all relevant times the Chaplain at UnityPoint Health-Meriter Hospital in Wisconsin and is employed by Meriter.

16. Defendant, Karl Nibbelink is at all relevant times a member of the Ad Hoc committee, UnityPoint Health-Meriter Hospital and is employed/agent of Meriter.

17. Defendant, Elizabeth Pritts is at all relevant times a member of the Ad Hoc committee, UnityPoint Health-Meriter Hospital and is employed/agent of Meriter.

18. Defendant, Sherry Henseler is at all relevant times a member of the Ad Hoc committee, UnityPoint Health-Meriter Hospital and is employed/agent of Meriter.

19. At all relevant times, UW and Board of Regents employed Dr. Mezu-Ndubuisi.

20. At all relevant times, Meriter has been a joint employer with UW and the Board of Regents where all defendants controlled the terms and conditions of employment of Dr. Mezu-Ndubuisi.

21. All acts and failures to act alleged herein were duly performed by and attributable to all Defendants, each acting as a successor, agent, alter ego, employee, indirect employer, joint employer, integrated enterprise, or under the direction and control of the others, except as specifically alleged otherwise. Said acts and failures to act were within the scope of such agency and/or employment, and each Defendant participated in, approved, and/or ratified the unlawful acts and omissions by the other Defendants complained of herein. Whenever and wherever reference is made in this Complaint to any act by a Defendant or Defendants, such allegations and reference shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

22. Plaintiff is ignorant of the true names and capacities of each defendant sued as DOES 1 through 10, inclusively, and therefore Plaintiff sues said defendants by fictitious names. Plaintiff reserves the right to amend the complaint to name each DOE defendant individually or corporately as it becomes known. Plaintiff alleges that each DOE defendant was in some manner responsible for the acts

and omissions alleged herein and Plaintiff will amend the complaint to allege such responsibility when the same shall have been ascertained by Plaintiff.

**JURISDICTION**

23. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination on the basis of race, color, religion, sex or national origin and the Family and Medical leave Act ("FMLA") and Title I of the Americans with Disabilities Act of 1990 as amended.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

24. All conditions precedent to filing claims under Title VII have been performed or have occurred. Dr. Mezu-Ndubuisi filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on May 7, 2021, with the Wisconsin EEOC against the University of Wisconsin, Board of Regents and UnityPoint Health-Meriter Hospital. Wisconsin EEOC transferred the case to the Los Angeles District Office and was assigned charge number 443-2021-01487. Los Angeles EEOC issued a right to sue notice on July 11, 2023. (See Exhibit A).

FMLA does not require the exhaustion of administrative remedies.

25. This case is brought within 90 days of the receipt of the EEOC notice of the right to sue on July 12, 2023 (by counsel) and (by Plaintiff).

PLAINTIFF'S COMPLAINT

26. Plaintiff has fully exhausted her administrative remedies and is entitled to file in the district court because the Los Angeles EEOC gave her the right to sue in the district. The Complaint has been filed within the appropriate time.

## STATEMENT OF FACTS

27. Dr. Olachi Mezu-Ndubuisi was hired in 2013 as an Assistant Professor and physician-scientist in the Division of Neonatology, Department of Pediatrics at University of Wisconsin (UW) School of Medicine and Public Health with an affiliate appointment in the Department of Ophthalmology and Visual Sciences. She has a Doctor of Optometry degree, *summa cum laude*, prior to obtaining a medical degree, and completing three years of Pediatric residency, and more than three years of neonatology fellowship training.

28. Plaintiff is a black African woman whose national origin is from Nigeria, a member of the Igbo ethnic group in that nation. She is also a naturalized citizen of the United States.

29. As part of her duties, in addition to research activities on oxygen-induced eye disease and lung disease in premature infants, she maintained clinical privileges at American Family Children's Hospital (AFCH) at UW Hospitals and Clinics, as well as clinical privileges at UnityPoint Health-Meriter Hospital, a UW partner.

30. Meriter, as a joint employer with UW and the Board of Regents exercised significant control over Dr. Mezu-Ndubuisi's work and dictated the terms and

7

conditions of her employment as well as exercising significant financial control over her as will be seen below.

### History of Discrimination for Seven Years:

31. Once Dr. Mezu-Ndubuisi was hired in 2013, before she began any clinical work, the Chair of Pediatrics Department UWSMPH, Dr. Ellen Wald, informed Plaintiff that she would be subjected to monitoring and supervision of her clinical work at Meriter Hospital, without justification. UW sent a letter to the credentialing committee stating that she had suggested modification of her privileges to include monitoring of her clinical work, which was untrue. Similarly situated colleagues who were not black African Americans and not of Nigerian national origin were not treated this way by UWSMPH or Meriter Hospital.

32. All of Plaintiff's evaluations since hire have met and exceeded expectations for clinical and research work, and described as "outstanding," and no concerns have ever been raised verbally or in writing by her direct supervisor, Dr. McAdams or her Chair, Dr. Wald.

33. Since Plaintiff's hire on November 1, 2013, she has been subjected to racial discrimination, microaggressions, rude and unprofessional behavior, including unwarranted public humiliations by some staff at both AFCH and Meriter Hospitals, including through filing of false and biased patient safety reports. Despite her raising these concerns to leadership in both institutions these racial

injustices have gone unaddressed, and instead she was penalized and subjected to monitoring and restrictions of her clinical activities over the years, while the perpetrators were protected.

34. During the first four to five years since hire, Plaintiff was the only underrepresented minority neonatologist in the Division of Neonatology, Department of Pediatrics, USMPH. Other colleagues who were not black African Americans of Nigerian national origin were not subjected to the same racial discrimination. Since 2019, two other minority physicians were hired after training at UWSMPH and have shared concerns of racial discrimination and wrote letters of support on Plaintiff's behalf in January 2021, which were ignored by UWSMPH and Meriter Hospitals and their investigating committees.

35. The false patient safety reports against the Plaintiff were filed by some staff at Meriter who had agreed with Plaintiff's clinical management or clarifications given, and sometimes they were filed without anyone expressing dissent or seeking clarifications for any questions they had about Plaintiff's clinical decisions that were made. The patients involved in these reports all improved under Plaintiff's care, and other colleagues who were not black African Americans of Nigerian national origin with similar management like Plaintiff did not have patient safety reports filed against them.

36. These patient safety reports are forwarded by Meriter NICU leadership to its Peer Review Committee without anyone asking Plaintiff for clarifications or bringing it to her attention. The Peer Review Committee then contacts her in writing in 2, 4 or sometimes 6 months after the alleged event for a response. Despite Plaintiff's detailed responses given with literature evidence and reference supporting her standard of care provided, the committee did not acknowledge that the reports were incorrectly filed. The committee also ignored her written concerns that she was treated unfairly unlike other colleagues who were not black African Americans of Nigerian national origin. The committee also ignored her response that there needed to be improved communication and respectful interactions amongst staff and not indiscriminate filing of unwarranted reports.

## Discrimination in False Patient Safety Reporting

37. On May 20, 2020, Plaintiff received notification of two falsely filed patient safety reports from the Maternal Child Multispecialty Peer Review Committee (MPRC) of Meriter Hospital. In her response on June 2nd, 2020, in addition to providing the literature evidence supporting her management, she explained that the two cases were about twin newborn girls under her care who had improved clinically with Plaintiff's management of their lung disease, and that the new nurse practitioner graduate on her first night of call with her requested a 10ml/k fluid bolus for a sodium level of 138 despite the infants being stable

with normal vital signs and urine outputs. Plaintiff explained to the nurse practitioner graduate that the sodium level was normal and expected with resorption of excess fluids from the infants' lungs. Plaintiff agreed that she could give a bolus on the second infant, so as not to discourage her.

38. After thanking Plaintiff for explaining the physiology behind her management and agreeing to it, this nurse practitioner still filed a patient safety report. In Plaintiff's response to the committee, she showed graphs depicting how the same infant had sodium levels that were actually above normal at different points in the clinical course and asked if patient safety reports had been filed against those neonatologists who were not black African Americans of Nigerian national origin. Plaintiff also stated in her response to the peer review committee that the patient safety reports were falsely filed, and that she was repeatedly being treated differently due to her race.

39. On June 11, 2020, Plaintiff received a letter from the Peer Review Committee acknowledging her concerns "regarding the Peer Review process, work environment, and workplace discrimination."

40. On June 26th, 2020, Plaintiff received notification from the Peer Review Committee that the two cases had been deemed "significant" deficiencies on her part.

41. On June 23, 2020, Meriter's Chief Medical Officer (CMO), Dr. Pam Wetzel, wrote inviting Dr. Mezu-Ndubuisi to a meeting to discuss her experiences at Meriter based on her comments in her response to the Peer Review cases.

42. On July 10, 2020, Dr. Mezu-Ndubuisi, attended a meeting on invitation with the Meriter CMO, Dr. Pam Wetzel and Mr. Kingsley Gobourne, Meriter Diversity, Equity, and Inclusion Officer, where Plaintiff discussed her concerns of racial discrimination in the clinical setting, and spoke generally about her views and advocacy for compassion amongst staff and how medical staff should strive to be servant leaders. Dr. Wetzel verbally and in a written response to Plaintiff's follow-up email after the meeting, expressed thanks for her thoughtful comments saying that it was a pleasure to meet the Plaintiff and "learn about your thoughts on patient care and colleague relationships."

**Retaliation for Reporting Racial Discrimination in Patient Safety Reporting:**

43. On July 23, 2020, Dr. Mezu-Ndubuisi was called to another meeting by Meriter CMO, Dr. Pam Wetzel. Present at that meeting was Dr. Elizabeth (Liz) Goetz, the Chair of Pediatrics at Meriter, during which Plaintiff was told that a Focused Professional Practice Evaluation (FPPE) was being initiated against her due to having three patient safety reports with noted deficiencies filed in a 12-month period.

44. Plaintiff submitted to the FPPE while expressing her disagreement with their policy and that the process was unjust and retaliatory. Plaintiff sent a follow-up email to Dr. Wetzel and Dr. Goetz stating that her concerns about the abuse of the patient safety reporting system by some staff were being ignored, and that she was unjustly being mandated to the FPPE, and that other colleagues who were not black African Americans of Nigerian national origin were not treated this way.

45. Plaintiff repeated her concerns of years of racism against her in the Meriter NICU. Dr. Goetz replied saying "**I want to acknowledge that what you are communicating here has merit and absolutely needs to be addressed**." Dr. Goetz continued, stating that she was "committed to this issue and improving the climate in our workplace" and "**the culture of the NICU and Nursery**." Still, nothing was done to address the racial discrimination and abuse of the patient safety reporting system or peer review process.

46. On the first FPPE check-in meeting on September 14, 2020, with Plaintiff's direct supervisor and Neonatology Division Chief, Dr. Ryan McAdams, and Dr. Liz Goetz, via phone, Dr. McAdams stated that he did not agree with the FPPE and was not aware of the patient safety reports leading to it. Dr. McAdams further stated that he has reviewed the patient safety reports and agrees with Plaintiff's clinical management of the babies involved, and that he would have managed the patients the same way that Plaintiff did.

**Discrimination for Advocating for Safe Care of a Minority Child who died.**

47. On September 28, 2020, Plaintiff advocated for a minority child who died unexpectedly at eight days of life, after it was suddenly noted that he appeared ill on Plaintiff's first day of meeting him in the NICU. Plaintiff provided compassionate care to him and his parents in his last hours of life. In several debriefs held following this unfortunate demise, Plaintiff supported her team compassionately, and they thanked her for her leadership during the code and compassionate care of the family. No concerns were brought to the Plaintiff's attention.

48. The parents of the deceased infant also thanked Plaintiff and the medical team for their kindness and support on that day and two months later when they received autopsy reports. The medical team that helped care for him agreed on two Meriter NICU policies that should be reviewed that may have prevented the team from recognizing that the baby was ill earlier, and as the team leader that week, Plaintiff said that she would bring these concerns up to the larger neonatology team.

49. On October 1, 2020, during a Thursday, Neonatology Division case conference, Plaintiff mentioned the two policies that should be reviewed in order to ensure safe care of premature infants and that may have prevented and

helped detect the baby's illness earlier, and which could have prevented his sudden, unfortunate demise.

50. The NICU Director and Plaintiff's colleague, Dr. Nina Menda (attending the conference by phone remotely) vehemently refused to consider a review of these policies and was belligerent about her dissent to the hearing of all staff. On the same day, Plaintiff applied for a $50,000 clinical research grant to Meriter Foundation.

**Retaliation, disparate treatment, hostile work environment, harassment, and Unjust Targeting**

51. As is customary, Meriter allows NICU doctors to take calls from home if all is stable.

52. On October 24, 2020, Plaintiff worked a long, 14-hour shift on call in the NICU with numerous microaggressions and dehumanizing acts of racial hostility, including finding out that there were two infants with critically abnormal sodium levels of about 119 mEq/l and about 152 mEq/l respectively in the NICU, and no patient safety reports had been filed against the neonatologists previously caring for them, but Plaintiff was undergoing FPPE for a normal sodium level of 138 mEq/l.

53. Plaintiff came home at night, checked in on the nurse practitioner to ensure all was stable. Plaintiff had a headache, took tylenol, and sat on the couch to rest and went to sleep. She woke up to see that she had two missed calls to her cell

phone to care for an infant. The period of the missed call was 1 hour 38 minutes. She drove to the NICU, apologized sincerely for the delay, relieved the doctor called in to briefly cover for her, and completed her shift. The infant in question was well and clinically stable for the rest of her shift. Dr. Nina Menda, the NICU Director, called while Plaintiff was in the NICU, and she returned her call once she ensured all was stable.

54. Dr. Nina Menda wanted to know if Plaintiff was well or needed to take the rest of the night off. Plaintiff apologized for missing the call, saying that she would complete her shift in the hospital. Plaintiff completed her shift and stayed on the next day to complete her day shift.

55. On October 26, 2020, Dr. Nina Menda informed Plaintiff that a patient safety report had been filed due to the missed call, and that she was forwarding Plaintiff's missed call to the Meriter Peer Review committee, falsely alleging that Plaintiff did not answer the call for 2 hours; did not activate Flex attending knowing that the Plaintiff was ill; and that Plaintiff came to work knowing that she was ill. This was despite Dr. Menda knowing that the missed call was unintentional and unplanned.

56. Plaintiff reminded Dr. Nina Menda that the missed call was unplanned and unintentional, and that she did not intentionally refuse to answer the call or to call the backup Flex attending or come to work knowing that she was ill.

PLAINTIFF'S COMPLAINT

57. Plaintiff felt threatened and targeted. She reminded Dr. Menda that she would not treat any other neonatologists this way. Plaintiff asked her if her goal was to get her fired, and she responded that "there had to be consequences" for the missed call.

58. Unbeknownst to the Plaintiff, Dr. Menda solicited a letter from the Meriter chaplain, Chaplain Amanda Lindsay, with false accusations about Plaintiff's care of the infant and family from September 28, 2020. The chaplain began the letter by stating that she was asked to address the letter to Dr. Nina Menda.

59. Dr. Nina Menda did not disclose to the Plaintiff that she had a letter from the chaplain about the Plaintiff or give the Plaintiff an opportunity to clarify any misconceptions or allegations that were raised.

60. On October 27, 2020, Plaintiff went to her primary care provider and relayed the events of the missed call due to sleeping and informed her of her experience of racial discrimination at work. Plaintiff requested for a medical leave because of the current stress.

61. Plaintiff's primary care provider, a UW trained and board-certified physician, agreed that a medical leave was needed due to work stress and a hostile work environment. She did not recommend any testing.

62. On October 27, 2020, one of Plaintiff's employers, University of Wisconsin, accepted her medical leave request and classified it as an FMLA leave.

63. On October 27, 2020, Dr. Nina Menda again, wrote in an email copied to Meriter CMO, Dr. Pam Wetzel, that she was forwarding Plaintiff's missed call to Meriter's Peer Review Committee. This was under the false claims that the Plaintiff did not answer and activate Flex attending. Dr Menda knew it was unintentional and unplanned.

64. Plaintiff responded again to Dr. Menda (copied to Dr. Wetzel) reiterating that she was sorry she missed the call, and that she had already informed Dr. Menda that it was unintentional and unplanned, and an emergency. The Plaintiff recounted their previous conversation in the email and informed her that she was on medical leave starting from October 27, 2020.

65. Plaintiff reiterated that other similarly situated neonatologists who were not black African Americans of Nigerian national origin would not be treated this way.

66. Plaintiff continued with her research work, lab experiments, lab meetings, published two research articles, and submitted an NIH grant, and began working on two other grants during her medical leave. She was in frequent communication regarding her research progress and grants by email with her Pediatric Department Chair, Dr. Ellen Wald.

67. On November 5, 2020, Meriter invited the Plaintiff to present her research grant application to the Meriter Education committee. She gave a 30-minute

power point presentation in person to a committee of over twelve physician staff to enthusiastic applause.

68. A physician colleague that was present at the meeting was also a member of the Ad Hoc Committee investigating the allegations against the Plaintiff.

69. Meriter awarded a $50,000 research grant to the Plaintiff following her presentation.

70. On November 20, 2020, Plaintiff was cleared by her primary care doctor to return to full clinical work without restrictions.

71. On November 23, 2020, Plaintiff was informed by her Department Chair, Dr. Ellen Wald, in the presence of a UWSMPH Human Resources representative during a video call to stop work due to investigations against her regarding a missed call and a complaint against her regarding a day a staff was called to the Meriter NICU.

72. Just as on other occasions, the details of the allegations were not disclosed to the Plaintiff despite her requests. Plaintiff reminded the chair that she had been subjected to unfair and unjust treatment over the years due to her race. The Chair still insisted that she stopped working pending the results of the investigations. Plaintiff stopped work.

73. On December 21, 2020, Plaintiff received an email from Meriter Medical Staff Office informing her that an ad hoc committee had been formed to investigate the 1) Ongoing FPPE; 2) Her missed call of October 24, 2020 and 3) A

complaint about her conduct on September 28, 2020 filed by a staff. Meriter refused to disclose the allegations against the Plaintiff stating that their bylaws do not allow it. Meriter only shared the letter from a chaplain and stated that the other details would be made available during her interview with the Ad Hoc committee scheduled for January 4, 2021.

74. On December 31, 2020, Plaintiff responded to the Ad Hoc Committee refuting the false claims by the chaplain, which were not collaborated by the witnesses present and the mother of the minority infant who had expressed sincere thanks for the compassionate care from the Plaintiff and the staff towards her and her infant.

75. Plaintiff recounted in her email that she had been subjected to seven years of racial discrimination as a minority staff, a female black American of Nigerian national origin which has gone unaddressed by leadership. She asked for a prompt amicable resolution to these false allegations and investigations, and to be allowed to return to clinical work.

76. Plaintiff's email and concerns were not answered or addressed. She shared letters of reference from colleagues and trainees attesting to her professionalism, clinical skills, collegiality, and value to the department.

77. On January 4, 2021, Plaintiff met with the Ad hoc committee members, for an hour, made up of four white medical staff namely, Dr. Nicole Baumann-Blackmore, Dr. Karl Nibbelink, Dr. Elizabeth Pritts, and their representative

Sherry Henseler, RN. The Ad Hoc Committee was focused on how Plaintiff would cope with stress when she returned to work. They did not question her about the FPPE or Chaplain's letter. She informed them that she missed the call due to sleeping at night after a long, stressful day. When she asked, they denied that they were rejecting Plaintiff's doctor's FMLA return to work certification. They stated that it appeared that her "medical emergency" was an acute stress reaction. They did not mention any further concerns about the missed call.

78. On January 22, 2021, Plaintiff shared more letters of reference with the committee and included minority advocate physicians. The Ad Hoc committee replied threatening her with HIPAA violations and saying that they would defer to UWSMPH regarding her return to work.

79. On January 25, 2021, during an FPPE video meeting with her direct supervisor and Neonatology Division Chief, Dr. Ryan McAdams and Dr. Liz Goetz, Meriter Pediatrics Chair, Dr. McAdams informed Plaintiff that the Ad Hoc investigations against her were escalated in error and had gone out of hand. Dr. McAdams stated that he did not agree with any of the patient safety reports against her and praised her clinical skills, professionalism, and compassion. He apologized for not advocating for her and promised to stand up for the truth. Dr. Goetz and Dr. McAdams both acknowledged that Plaintiff had been treated unfairly and agreed with Plaintiff's concerns of the abuse of the patient safety reporting system. Both Dr. Goetz and Dr. McAdams expressed their admiration

21

for how Plaintiff was handling all this unfair scrutiny and investigations with so much grace, calm, and inner strength.

80. Dr. McAdams further stated that the mother of the baby in his recent meeting with her had thanked the Plaintiff. He had shared his email of this meeting with Plaintiff on December 24, 2020. He also stated to Dr. Goetz's hearing that the reports of the chaplain were not collaborated by witnesses at the code of September 28, 2020.

81. On January 26, 2021, the Ad Hoc committee ordered the Plaintiff to undergo a Vanderbilt Comprehensive Assessment Program test for neuropsychological testing, psychiatric evaluation, drug and addiction testing, at her own cost, without justification. They also wanted unrestricted access to her medical records and communication with the evaluators of the test.

82. Plaintiff requested the rationale for the order for the Vanderbilt testing numerous times between February 8, 2021, and March 10, 2021, but the committee never responded. She explained to the committee that she was being retaliated against for bringing up claims of racial injustice. The committee said that Meriter CMO, Dr. Pam Wetzel had been informed of her racial concerns. She recalled that the CMO had been made aware of her concerns about racism ever since July 23, 2020, but the racial issues had not yet been resolved.

83. The committee then requested a second meeting with the plaintiff to talk about an alleged missed call from August 2017 that was not one of the investigation's

original three claims. Plaintiff reminded them of this and said they were investigating her to try to discredit her. She requested that the committee submit written questions so that she may respond to them in writing. Plaintiff stated that she would be willing to meet with the committee once they had a minority member who would be more sympathetic to and consider her concerns about racial discrimination and targeted reporting. The committee did not address her concerns. They did not request witnesses from her, didn't reveal who they had spoken with, and didn't provide her with any information about the people they had.

84. On February 1, 2021, Plaintiff met with her direct supervisor, Dr. Ryan McAdams, for her annual review. He gave her high marks for her clinical and research work as well as her contributions to the department. He stated his advocacy for her and his regret for the way the investigations were handled and the unfair way she had been treated. He once more stated his disagreement with the FPPE, the Chaplain's letter, and the unfair way the missed call was handled. He expressed regret for not speaking up earlier and promised to support Plaintiff.

85. Dr. McAdams sent Plaintiff a signed summary of Plaintiff's accomplishments and assessment of her clinical work as satisfactory for the current academic year on February 19, 2021, which Plaintiff also signed. No concerns were raised.

86. On March 29, 2021, Plaintiff published an article in Journal of American Heart Association, titled Unmasking Systemic Racism and Unconscious Bias in Medical Workplaces: A Call to Servant Leadership: https://www.ahajournals.org/doi/10.1161/JAHA.120.018845

87. Plaintiff shared a link with her Chair, Ellen Wald who shared it to the whole department calling it powerful and beautifully written. Plaintiff received a lot of emails and messages from minorities and non-minorities agreeing with the issues raised in her article and the minorities recounted having similar experiences.

88. On April 14, 2021, the Ad Hoc Committee representative requested in an email that Plaintiff sign the completion of the FPPE. Included in the email to her were Dr. McAdams, Dr. Goetz, and Meriter CMO, Dr. Wetzel. Plaintiff did it under duress restating her disagreement with the process and biased reporting. She again reiterated her concerns of racial discrimination and expressed her hope to return to clinical work. She was reminded by the Ad Hoc Committee that this was separate from the Ad Hoc report.

89. On April 16, 2021, Ad Hoc committee released its report misrepresenting the facts of the investigation and Plaintiff's communications with them and presenting for the first time a list of people interviewed without clarifying what they said and how it related to the specific investigations. They did not comment on the justification or validity of the FFPE cases, or the validity of

24

the chaplain's false allegations, or Plaintiff's responses to these allegations. They raised their speculations that the missed call was due to a medical incident that posed a threat to patient safety, without any evidence, despite knowing that Plaintiff missed the call due to sleeping. The Ad Hoc Committee recommended that the Medical Executive committee and board of directors terminate Plaintiff's privileges if she did not do the Vanderbilt or alternate testing.

90. The Plaintiff, on April 22, 2021, filed a response refuting the misrepresentations in the Ad Hoc Committee's report with evidence of a 7-year history of racial discrimination, including letters of support. Plaintiff also voluntarily submitted her medical records from her October 27, 2020 medical visit and the November 20, 2020 follow up visit with her primary care doctor which collaborated her accounts. She sent copies to her Chair, Dr. Wald, and the Dean of UWSMPH, Dr. Robert Golden. She reiterated that the Ad Hoc Committee's recommendation for Vanderbilt testing was in retaliation for her concerns of racism and biased reporting. She expressed that the solution for racism was not to label the minority physician as having a neuropsychological disorder. Plaintiff urged UWSMPH and Meriter leadership to review and revise their policies, procedures, and workplace cultures for inequities, unfair, and unsafe practices

91. In a meeting with Dr. Wald on April 23, 2021, Dr. Wald stated that everything Plaintiff had written in her April 22, 2021 response was absolutely true. She acknowledged that Plaintiff had gone through "some bad stuff" over the years. She stated that Plaintiff was trying to fight a whole institution without a lawyer, and repeated several times that she would be terminated and that it would be reported to a national database for physicians, which would prevent Plaintiff from obtaining any other employment as a physician. Dr. Wald stated that Meriter's request for Plaintiff to do Vanderbilt testing was "crazy and inappropriate". She asked if Plaintiff would consider doing a neurological testing. Plaintiff responded that there was no justification for a neurological test.

92. Plaintiff reminded Dr. Wald that she had submitted her medical records with the email, and that should answer all their questions. Dr. Wald stated that she did not notice Plaintiff had sent her medical records, and that she would meet with Meriter CMO, Dr. Pam Wetzel, and see if Meriter would accept her medical records. She then asked the Plaintiff if Meriter came back asking her to do a neurological test, would she agree? The plaintiff, again, responded that there was no justification for it. Plaintiff asked Dr. Wald to reassign her to clinical duties. The Ad Hoc report stated that it was UW that stopped Plaintiff from working. Dr. Wald refused and stated that Plaintiff had to work at both AFCH and Meriter.

93. On April 26, 2021, Dr. Wald told the Plaintiff in an email to resend her medical records to the committee, sign a release for Meriter to speak to her doctor, and that she should suggest an alternative to the Vanderbilt testing. Plaintiff responded in agreement to these directives as long as they followed FMLA regulations.

94. On April 27, 2021, Plaintiff submitted an Addendum to the Ad Hoc Committee, along with her medical records, authorizing them to contact her doctor in accordance with FMLA regulations and agreed to alternate testing in accordance with FMLA regulations. On April 28, 2021, Meriter asked the Plaintiff to sign an authorization for them to speak to her primary care doctor, and mandated an alternate testing that would include: a complete physical exam, psychiatric evaluation, neuropsychological testing, and addiction evaluation and screening. They specified that no UW or Meriter affiliated provider could be the evaluator.

95. Plaintiff engaged an attorney on April 30, 2021 who sent a letter to the Ad Hoc Committee c/o the Meriter Medical Staff representative, copied to Dr. Ellen Wald, chair of Pediatrics and Dr. Robert Golden, Dean of UWSMPH, expressing her willingness to do the specified alternate testing despite her disagreement with it and the lack of justification for it. Plaintiff identified the Medical College of Wisconsin as the facility to do it. She suggested that to

PLAINTIFF'S COMPLAINT

ensure an unbiased, fair, objective evaluation that all communication be written between Meriter and her providers/evaluators.

96. Meriter responded on May 4, 2021, that they were in agreement with the testing taking place at Medical College of Wisconsin but mandating that the physical examination had to be performed by an internist or family practitioner rather than a psychiatrist. They included a form for the Plaintiff to sign authorizing the release of her medical information, which was most recently updated in January 2021. They requested unrestricted oral and written communication with the evaluators and releases from liability for any outcomes resulting from the information shared, including the guarantee that Plaintiff not sue Meriter or the evaluators. The January 2021 authorization was remarkably different from the prior one.

97. Meriter also sent Plaintiff an updated authorization form that she needed to sign giving them permission to communicate verbally and in writing with her primary care physician.

98. On May 5, 2021, Plaintiff signed a revised authorization to allow written and verbal communication with her primary care provider. She suggested that they record any oral communication with providers.

99. Meriter responded, rejecting any recording of conversations. Plaintiff agreed to the written and unrecorded oral communication with the evaluators and provided an internist to do the physical exam. Plaintiff objected to the language

PLAINTIFF'S COMPLAINT

in the authorization that stated that she would not sue Meriter or its employees or the evaluators, as this was unnecessary and conveyed the intention that Meriter would have biased communications with the evaluators. Plaintiff believed that it was an infringement of her individual's rights to equity and justice.

100.    Plaintiff's attorney requested for the by-laws on May 6, 2021, requesting that the language releasing Meriter and evaluators of all liability be removed or revised, and that Plaintiff had complied with all their directives in a bid to move forward and return to clinical work. Meriter responded that the language will not be removed or modified and was included in their by-laws. They then sent excerpts of the Meriter by-laws which were just recently updated in January 2021 instead of the one prior to that which should have governed these issues that arose prior to 2021.

101.    Seeking an amicable resolution and to return to her clinical duties, Dr. Mezu-Ndubuisi agreed to alternate testing and was informed by Meriter Hospital that it had to be performed by non-UW and non-Meriter physicians and had to comprise neuropsychological, medical, psychiatric, and addiction testing. Dr. Mezu-Ndubuisi had to go as far as Medical College of Wisconsin, Milwaukee, and Chicago to find providers willing and able to perform the testing at short notice. The evaluators concluded that Dr. Mezu-Ndubuisi was healthy and did not have any medical condition that posed a threat to patient

safety. Meriter hospital rejected the reports provided by the evaluators and continued to insist that Dr. Mezu-Ndubuisi undergo the VCAP evaluation.

102.     To avoid termination of her clinical privileges and threatened with reporting to the National Physician database which would jeopardize her medical career, Dr. Mezu-Ndubuisi agreed to the VCAP testing.

103.     On June 3 and 4, 2021, Dr. Mezu-Ndubuisi traveled at her own expense to Vanderbilt University Hospital in Nashville, Tennessee to be evaluated. The Vanderbilt evaluators reported that Dr. Mezu-Ndubuisi did not have any medical, psychiatric, behavioral disorder, and did not have any medical condition that would pose a threat to patient safety.

104.     The Meriter Ad Hoc Committee unduly biased and influenced the Vanderbilt evaluators with false, biased reports of Dr. Mezu-Ndubuisi leading the Vanderbilt evaluators to suggest that Dr. Mezu-Ndubuisi be monitored upon return to clinical work if her concerns of work stress continued.

105.     The Meriter Ad Hoc Committee recommended that the Meriter Board mandate a "reintroduction plan" above and beyond the Vanderbilt suggested recommendations to include daily monitoring of Dr. Mezu-Ndubuisi during clinical rounds, weekly and monthly check-ins, as well as mandated weekly counseling with liability releases to allow Meriter leadership communicate with the counselor. Dr. Mezu-Ndubuisi was given seven days, up to August 9, 2021 to sign, agreeing to these conditions prior to return to clinical work. UW,

working hand in hand with Meriter informed Dr. Mezu-Ndubuisi of their intention to enforce these Meriter recommendations, without any justification.

106.     Dr. Mezu-Ndubuisi's clinical competency, professionalism, and skills have never been questioned by her direct supervisor, Dr. McAdams, her Department Chair, Dr. Wald, or by her other employers, UW. Rather, she has been commended and recognized for her clinical and research excellence, including a recent professorship award with a 3-year research grant as the McPherson Eye Research Institute Retina Research Foundation Edwin and Dorothy Gamewell Professor starting July 1, 2021 while in the midst of the Ad Hoc investigations by Meriter Hospital. Meriter and UW created a hostile work environment by subjecting Dr. Mezu-Ndubuisi to unjustified monitoring of her clinical work. Dr. Mezu-Ndubuisi alleges that she was discriminated against based on her race as an African American of Nigerian origin, and that the Vanderbilt Mandate and re-introduction plan were in retaliation for her raising concerns of racism to UW and Meriter leadership.

107.     Dr. Mezu-Ndubuisi was officially stopped from clinical work on November 23, 2020 by Dr. Wald, Chair of UW Pediatrics Department, and she did not receive any official written communication from Dr. Wald reassigning her to clinical duties, meeting attendance and communications, despite being aware that Dr. Mezu-Ndubuisi was cleared by the Vanderbilt testing and multiple alternate tests.

108.     Dr. Mezu-Ndubuisi was denied a return to full, unrestricted clinical practice at UW and Meriter without justification.

109.     On August 4, 2021, Dr. Mezu-Ndubuisi submitted paperwork for FMLA leave for her minor daughter's serious medical condition requiring surgery and constant daily care. UWSMPH FMLA representatives, in collaboration with Dr. Mezu-Ndubuisi's supervisor, Dr. Ryan McAdams and Chair, Dr. Ellen Wald delayed approval of FMLA violating Dr. Mezu-Ndubuisi's rights.

110.     Prior to August 4, 2021, Plaintiff applied for promotion to an Associate Professor at UW with tenure. She was denied even though she was qualified.

111.     All of these were done in a continued effort to harass, intimidate, and retaliate against Dr. Mezu-Ndubuisi for speaking up against racial discrimination, and retaliation, hostile work environment and harassment from UnityPoint Health-Meriter hospital and University of Wisconsin School of Medicine and Public Health.

112.     And while the Plaintiff was on FMLA leave for her minor daughter, UW stopped paying her salary.

113.     Meriter and UW never reinstated Dr. Mezu-Ndubuisi to her clinical privileges at Meriter hospital despite subjecting her without justification to onerous and invasive psychological, physical, and emotional tests.

PLAINTIFF'S COMPLAINT

## **FIRST CAUSE OF ACTION**

**(Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e. et seq.)**

114.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

115.    At all times hereto, the Title VII racial discrimination laws were in full force and effect and were binding upon Defendants and each of them.

116.    Dr. Mezu-Ndubuisi was at all times relevant herein an employee and applicant covered by U.S.C. 42 § 2000e *et seq*.

117.    Defendants were at all times aware that the Plaintiff is a black African Woman from Nigeria of Igbo ethnic origin.

118.    The Defendants' conduct as alleged at length herein constitutes discrimination based on race in violation of Title VII.

119.    The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

120.    Plaintiff suffered significant damages because of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and attorney fees and the costs of bringing this action.

121.    Defendants intentionally violated Plaintiff's rights under Title VII with malice or reckless indifference.

122.     Plaintiff is entitled to backpay, front pay, compensatory damages, punitive damages, attorney's fees, costs of suit, a declaration that Defendants violated her rights under Title VII.

## SECOND CAUSE OF ACTION
### (Title VII Retaliation)

123.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

124.     The discriminatory and retaliatory actions were undertaken by the defendants acting as agents, supervisors, joint employers, that had the purpose or effect of adversely affecting Dr. Mezu-Ndubuisi's continued employment, ability to return to work after a leave and perform her clinical duties on the same terms as was available to similarly situated Meriter and UW employees when they came back from leave.

125.     Defendants' discrimination and retaliation had the effect or purpose of creating an intimidating, hostile, or offensive working environment, and the purpose of unreasonably interfering with Dr. Mezu-Ndubuisi's work performance.

126.     The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus.

127.     The actions were taken for the purpose of retaliating against Dr. Mezu-Ndubuisi for complaining about the discriminatory and retaliatory acts towards

her; her complaints that she raised about the patient safety issues at the Meriter NICU.

128.    Defendants are aware that Dr. Mezu-Ndubuisi is a black woman from Nigeria of Igbo ethnic origin.

129.    Defendants have expressed hostility towards Dr. Mezu-Ndubuisi's Igbo ethnic origin as described in the incorporated allegations.

130.    These retaliatory actions have created a hostile working environment for the Plaintiff.

131.    These retaliatory actions have caused the Plaintiff to suffer emotional, psychological, physical, and financial harm.

## THIRD CAUSE OF ACTION
## (FMLA INTERFERENCE

132.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

133.    Dr. Mezu-Ndubuisi was eligible for the protections of FMLA.

134.    The joint employers, UW and Meriter each have in excess of 501 employees.

135.    Dr. Mezu-Ndubuisi was entitled under the FMLA for the period that she sought to take care of her minor daughter's serious health condition.

136.    Dr. Mezu-Ndubuisi gave sufficient notice of her intent to take FMLA leave.

137.    The joint employers failed to respond in a timely fashion to the Plaintiff.

138.     The employers failed to pay the Plaintiff while she was on leave.

**FOURTH CAUSE OF ACTION**
**(FMLA RETALIATION)**

139.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

140.     The actions listed in all the preceding paragraphs were undertaken by the defendants acting as agents, supervisors, joint employers to retaliate against Dr. Mezu-Ndubuisi after she came back from her authorized FMLA leave.

141.     The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

142.     Dr. Mezu-Ndubuisi was placed on FMLA by her primary care doctor in order to deal with the stress that she was experiencing at work due to the multiple false patient safety reports that were filed against her and the toxic work atmosphere where her subordinates were second guessing her actions at the NICU. Other similarly situated employees were able to make independent decisions at the NICU without fear of being reported or being investigated and were not reported even when they were wrong.

143.     Dr. Mezu-Ndubuisi was cleared to return to work and submitted a back to work certification to her joint employers.

144.    Her joint employers refused to honor the return-to-work certification that had been signed by her doctor and refused to let her return to work despite being cleared by her doctors.

145.    Her joint employers failed to utilize the procedures that were called for in the FMLA legislation if an employer does not agree with a doctor's certification.

146.    Instead, her joint employers over a two-month period forced her to undergo multiple psychological, emotional, and psychiatric evaluations at her own expense and threatened to terminate her employment if she did not do it.

147.    After she sailed through those evaluations, her joint employers then forced her to undergo Vanderbilt testing at her own expense and further threatened to terminate her employment if she did not do it.

148.    Other similarly situated employees were not mandated at the threat of dismissal to undergo Vanderbilt testing or psychological, emotional, and psychiatric evaluations when they were cleared by their doctor to return to work after taking FMLA leave.

149.    After the Plaintiff sailed through the Vanderbilt testing, her joint employers still refused to let her return to work. They then concocted a monitoring system to monitor her work for a year at the Meriter NICU despite her having excellent performance reviews.

PLAINTIFF'S COMPLAINT

150.    Plaintiff believes and alleges that Plaintiff's use of the medical leave, engagement in protected activity were factors in Defendants' conduct as alleged herein above.

151.    These retaliatory actions have created a hostile and abusive working environment for the Plaintiff.

152.    Plaintiff suffered significant damages because of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and attorney fees, costs, and the costs of bringing this action.

### FIFTH CAUSE OF ACTION
### (HARASSMENT/HOSTILE AND ABUSIVE WORK ENVIRONMENT)

153.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

154.    The actions listed in all the preceding paragraphs were undertaken by the Defendants acting as agents, supervisors, joint employers to harass Dr. Mezu-Ndubuisi and to create a hostile and abusive work environment.

155.    The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

156.    The harassment was unwelcome and sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and created a hostile work environment.

157.    Despite having actual and constructive notice of the harassment herein, Defendants failed and refused to take prompt and appropriate action to stop the harassment and the resulting hostile work environment.

158.    Defendants did not properly handle the complaints made by the Plaintiff. Defendants failed to properly investigate and respond to complaints, discouraged additional complaints from being made, and failed to implement necessary remedial measures to end the harassment.

159.    The unlawful employment practices complained of above were intentional.

160.    The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of the Plaintiff.

161.    As a result, the Plaintiff suffered significant damages including emotional distress, past and future lost wages and benefits, and attorney fees, costs, and the costs of bringing this action.

**SIXTH CAUSE OF ACTION**
**(CONSTRUCTIVE DISCHARGE)**

162.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

163.    The foregoing conduct of the Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the

Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, as to entitle the Plaintiff to punitive damages.

164.    The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

165.    Plaintiff's joint employers were required to maintain an atmosphere free from discrimination, retaliation, and harassment.

166.    Despite many complaints to the joint employers, the discriminatory and retaliatory employment practices and harassment intensified.

167.    As a result, Plaintiff was forced to resign her position.

168.    As a result, the Plaintiff suffered significant damages including emotional distress, past and future lost wages and benefits, and attorney fees, costs, and the costs of bringing this action.

## SEVENTH CAUSE OF ACTION
## (DISABILITY DISCRIMINATION)

169.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs, inclusive, as though set forth in full herein.

170.     The Rehabilitation Act and the Americans with Disabilities Act expressly prohibit discrimination and harassment in employment and other terms, conditions, and privileges of employment on the basis of disability because of a current or past disability, an actual or perceived physical or mental impairment. (See 29 U.S.C. §§ 791, 2 et seq.; 42 U.S.C. §§ 12101, et seq.).

171.     The joint employers acting in concert with Meriter Ad Hoc Committee, Dr. Ellen Wald, and Dr. Nina Menda violated Plaintiff's right to privacy and discriminated against her based on past disability by using her unfortunate publicly known and disclosed personal medical history of loss of a premature infant thirteen years earlier and history of surviving a ruptured brain aneurysm to victimize her.

(https://www.obiolarosefoundation.org/; https://www.youtube.com/watch?v=G3LetQqBzJ4)

172.     Defendants subjected Plaintiff to invasive medical testing for psychiatry, neurological, and neuropsychological testing with no basis because she missed a call for 1 hr. and 38 minutes following a hostile work environment created by intense racial discrimination, as revealed during the Vanderbilt Comprehensive Assessment Program Testing ("VCAP").

173.     The VCAP evaluators responded directly to Meriter's questions whether Dr. Mezu-Ndubuisi's history of an aneurysm made her unfit to return to clinical practice, to which VCAP evaluators responded an emphatic "No" stating that Dr. Mezu-Ndubuisi's personal medical history had no role in the

missed call and that they believed the missed call was due to sleeping at the end of the long day following encountering acutely stressful work environment.

174.     Dr. Mezu-Ndubuisi's past medical history was never raised during Meriter's Ad Hoc investigations and she was never directly asked any of these questions yet it was posed to VCAP evaluators. Dr. Mezu-Ndubuisi's personal medical history was explicitly disclosed to her boss, Dr. Ellen Wald prior to hiring and reviewed by University of Wisconsin prior to hiring in 2013.

175.     The foregoing conduct of the Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, as to entitle the Plaintiff to punitive damages.

176.      The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

177.     As a result, the Plaintiff suffered significant damages including emotional distress, past and future lost wages and benefits, and attorney fees, costs, and the costs of bringing this action.

PLAINTIFF'S COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff seeks judgment against Defendants and each of them, in an amount according to proof as follows:

1. For a money judgment representing compensatory damages including lost wages, earnings, retirement benefits, and other employee benefits, and all other sums of money, together with interest on these amounts; for other special damages; and for general damages for mental pain and anguish and emotional distress and loss of earning capacity;

2. For prejudgment interest on each of the foregoing at the legal rate from the date the obligation became due through the date of judgment in this matter;

WHEREFORE, Plaintiff seeks judgment against Defendants and each of them, in an amount according to proof as follows:

1. For a declaratory judgment reaffirming Plaintiff's equal standing under the law and condemning Defendant's discriminatory practices;

2. For punitive damages;

3. Front pay;

4. For injunctive relief barring Defendants' discriminatory employment policies and practices in the future;

PLAINTIFF'S COMPLAINT

5.      Compensatory Damages for unjust denial of deserved Promotion to Associate Professor with tenure in spite of the approval of relevant assessment departmental bodies, equitable relief for lifetime lost wages resulting therefrom;

6.      Expungement of the negative and false reports in the Plaintiff's medical file and employment records;

7.      Compelling the Medical Executive Committee to reject the biased report and recommendations of the Ad Hoc Committee.

8.      For costs of suit, and attorneys' fees;

9.      For post-judgment interest; and

10.     For any other relief that is just and proper.

 Dated: October 9, 2023                              Respectfully Submitted,

                                                _____/s/ C. Valerie Ibe, Esq._____
                                                C. Valerie Ibe, Esq.
                                                Attorney for Plaintiff, Dr. Olachi Mezu-
                                                Ndubuisi.

PLAINTIFF'S COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff, Olachi Mezu-Ndubuisi hereby demands a jury trial in this matter.


Dated: October 9, 2023                              Respectfully Submitted,

                                                     __/s/ C. Valerie Ibe, Esq.
                                                     C. Valerie Ibe, Esq.
                                                     Attorney for Plaintiff, Dr. Olachi
                                                     Mezu-Ndubuisi.

PLAINTIFF'S COMPLAINT